IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

SPECIALIZED TRANSPORT & RIGGING, LLC,

                Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH and ASPEN CUSTOM TRAILERS, INC.,

                Defendants.

Case No. 3:20-cv-00188-TMB

**ORDER ON DEFENDANT ASPEN CUSTOM TRAILERS, INC.'S MOTION TO DISMISS (DKT. 33)**

## I.    INTRODUCTION

Before the Court is Defendant Aspen Custom Trailers, Inc.'s ("Aspen") Motion to Dismiss (the "Motion").[1] Plaintiff Specialized Transport & Rigging, LLC ("Specialized") opposes the Motion.[2] For the reasons discussed below, the Court finds it lacks personal jurisdiction over Aspen and **GRANTS** the Motion on that basis.

## II.    BACKGROUND

Specialized is an Alaska company that provides "logistics and transportation services within the State of Alaska."[3] Aspen is a Canadian company incorporated and headquartered in Alberta, Canada.[4] Although based in Canada, Aspen does some business in the United States.[5]

---

[1] Dkt. 33 (Motion); Dkt. 34 (Memorandum); *see also* Dkt. 43 (Reply).

[2] Dkt. 41 (Opposition).

[3] Dkt. 24 at 2, ¶ 7 (Amended Complaint).

[4] *Id.* at 2, ¶ 3; Dkt. 33-1 at 2 (Zork Declaration).

[5] *See* 41-2 at 2 (Screenshots of Aspen's Website) ("Aspen has a growing network of strong, regionally focused dealers who are highly trained and well equipped to provide parts and service

1

Aspen has attended trade shows in Las Vegas, Nevada.[6] Aspen's website claims the company takes "on the biggest heavy haul design and manufacturing challenges in North America."[7] And Aspen has sold trailers to "various" Alaska-based companies, including Specialized—Specialized employees report that Aspen is "well known" in Alaska and "has sold many of its trailers to various Alaska companies for use in Alaska."[8] They also report seeing Aspen trailers and equipment used in Alaska.[9]

In 2014, Aspen sold Specialized a custom heavy-duty trailer assembly—called a "Bomb Cart"—for $630,715 Canadian, or approximately $564,931 U.S.[10] The sale took place in Canada: Aspen executed the contract at its office in Alberta, Canada; Aspen manufactured the Bomb Cart in Alberta; no Aspen employee or representative traveled to Alaska for business related to the Bomb Cart; and Specialized picked up the Bomb Cart in Alberta.[11] This process is consistent with Aspen's "general business practice" to "execute purchase agreements for its custom equipment" in Alberta, to "build that custom equipment" in Alberta, "to have the purchaser of that equipment travel to" Alberta to pick up the equipment, "and for the purchaser to bear the responsibility of

---

for your Aspen trailer investment. Aspen's current dealers include; J & B Pavelka Inc. who service the US south markets and Peters and Keatts Equipment Inc. who service the Pacific Northwest.").

[6] *See* Dkt. 41-1 at 1 (Spencer Affidavit); Dkt. 41-4 at 1 (Hyce Affidavit); Dkt. 41-3 (Exhibitor List) (listing Aspen as an exhibitor at a 2017 tradeshow in Las Vegas); Dkt. 41-5 (Instagram Post) (stating "We are ready to go for MinExpo! . . . #lasvegasconventioncenter").

[7] Dkt. 41-2 at 1.

[8] Dkt. 41-1 at 1; Dkt. 41-4 at 1.

[9] Dkt. 41-1 at 1; Dkt. 41-4 at 1.

[10] Dkt. 24 at 3, ¶ 8; Dkt. 33-1 at 2.

[11] Dkt. 33-1 at 2–3.

2

transporting the equipment to the chosen destination."[12] In addition, the Bomb Cart came with a one-year limited warranty, which specified that defective materials "must be returned to Aspen's facility at the owner's expense for inspection" and "shall be repaired or replaced by Aspen at its facility."[13] The warranty includes a choice-of-law provision selecting "the laws of the Province of Alberta, Canada," as does the purchase agreement.[14]

In this lawsuit, Specialized alleges the Bomb Cart was defective.[15] Specialized claims that "[o]n March 30, 2019, the Bomb Cart broke while transporting items at a low rate of speed on the Elliot Highway, northbound for the Prudhoe Bay oil field" in Alaska.[16] After this incident, Specialized asserts, its insurer, American International Group, Inc. ("AIG"), declared the Bomb Cart a "total loss."[17] Specialized alleges this was the last time, but not the first, that the Bomb Cart broke "under its normal and intended use."[18]

Specialized originally filed this action against only its insurer, Defendant National Union Fire Insurance Co., a wholly owned subsidiary of AIG, raising claims for casualty loss and lost profits.[19] Specialized later added claims against Aspen for breach of contract and breach of implied

---

[12] Dkt. 33-1 at 3.

[13] Dkt. 33-3 at 2 (Warranty).

[14] *Id.*; 33-2 at 3 (Purchase Agreement).

[15] Dkt. 24 at 4, ¶ 12.

[16] *Id.*, ¶ 14.

[17] *Id.* at 4–5, ¶ 18.

[18] *Id.* at 4, ¶ 12.

[19] Dkt. 1 (Complaint).

warranty of fitness for a particular purpose.[20] In this Motion, Aspen argues those claims should be dismissed either (1) under Federal Rule of Civil Procedure ("Rule") 12(b)(2) because the Court lacks personal jurisdiction over Aspen, or (2) under Rule 12(b)(6) because Specialized fails to state a claim upon which relief can be granted.

### III. LEGAL STANDARD

Pursuant to Rule 12(b)(2), a defendant may move to dismiss a case on the basis that the Court lacks personal jurisdiction over them.[21] On a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of demonstrating that the court has jurisdiction.[22] In evaluating the defendant's motion, "[t]he court may consider evidence presented in affidavits to assist it in its determination."[23] Where, as here, the court bases its decision on written materials instead of holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts."[24]

"There are two independent limitations on a court's power to exercise personal jurisdiction over a nonresident defendant: the applicable state personal jurisdiction rule, and constitutional principles of due process."[25] Here, Alaska law authorizes courts within the state to exercise

---

[20] Dkt. 24 at 8–9.

[21] Fed. R. Civ. P. 12(b)(2).

[22] *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

[23] *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).

[24] *Schwarzenegger*, 374 F.3d at 800 (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)).

[25] *Loomis v. Slendertone Distrib., Inc.*, 420 F. Supp. 3d 1046, 1064 (S.D. Cal. 2019). The applicable state personal jurisdiction rule is Alaska's long-arm statute. *See Schwarzenegger*, 374 F.3d at 800 ("Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits.").

jurisdiction to the fullest extent permitted by federal due process.[26] Thus, the Court need only examine whether exercising jurisdiction in this case comports with due process.[27]

A court may exercise personal jurisdiction over a defendant consistent with due process only if the defendant has "'certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[28] "Unless a defendant's contacts with a forum are so substantial, continuous, and systematic that the defendant can be deemed to be 'present' in that forum for all purposes," i.e., that the defendant is subject to "general" jurisdiction in the forum, "a forum may exercise only 'specific' jurisdiction— that is, jurisdiction based on the relationship between the defendant's forum contacts and the plaintiff's claim."[29] Specialized argues the Court has specific, not general, jurisdiction over Aspen.

A court has specific jurisdiction over a non-resident defendant only when three requirements are met: "(1) the defendant either 'purposefully direct[s]' its activities or 'purposefully avails' itself of the benefits afforded by the forum's laws; (2) the claim 'arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction [ ] comport[s] with fair play and substantial justice, i.e., it [is] reasonable.'"[30] The plaintiff bears the burden to prove the first two requirements.[31] "If the plaintiff succeeds in satisfying both of the first

---

[26] *Alaska Telecom, Inc. v. Schafer*, 888 P.2d 1296, 1299 (Alaska 1995).

[27] *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).

[28] *Id.* (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

[29] *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006).

[30] *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)) (alterations in original).
[31] *Id.*

5

two [requirements], the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."[32]

"For part one of this three-part test," courts "typically analyze[] cases that sound primarily in contract"—as this case does—"under a 'purposeful availment' standard."[33] "To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'"[34] Courts evaluate "the quality and nature" of the defendant's contacts with the forum.[35] "Merely random, fortuitous, or attenuated contacts are not sufficient."[36]

While the Supreme Court has rejected a "mechanical" test to evaluate purposeful availment, it has recognized two concepts that are particularly helpful here. First, "the formation of a contract with a nonresident defendant is not, standing alone, sufficient to create jurisdiction."[37] A plaintiff must show something more, such as "a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State,"[38] efforts by the defendant to

---

[32] *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

[33] *See Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). Courts use the purposeful availment standard in products liability cases. *See Specter v. Rainbow King Lodge, Inc.*, No. 3:17-CV-00194-TMB, 2018 WL 11266538, at *4 (D. Alaska June 13, 2018). In contrast, for cases involving intentional tort claims, courts use a purposeful direction standard. *See id.*; *Boschetto*, 539 F.3d at 1016.

[34] *Id.* (quoting *Sher*, 911 F.2d at 1362).

[35] *Int'l Shoe Co.*, 326 U.S. at 319.

[36] *Picot*, 780 F.3d at 1211.

[37] *Boschetto*, 539 F.3d at 1017; *see also Picot*, 780 F.3d at 1211 ("[A] contract alone does not automatically establish minimum contacts in the plaintiff's home forum.").

[38] *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (quoting *Burger King*, 471 U.S. at 479–80)).

"continuously and deliberately exploit[]" the forum state's market through salespeople or advertising,[39] examples of the defendant closing sales or performing services in the forum state,[40] or a choice-of-law provision selecting the law of the forum state.[41] In contrast, a contract does "not give rise to specific jurisdiction in the forum" where "the business relationship between the parties was fleeting or its center of gravity lay elsewhere."[42] As the Supreme Court has said, the defendant's contacts with the forum "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship *centered* there."[43] Thus, when evaluating whether a contract gives rise to jurisdiction, courts consider the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."[44]

Second, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause."[45] For example, the Supreme Court has explained, "[i]n *Hanson v. Denckla*, . . . it was no doubt foreseeable that the settlor of a Delaware trust would subsequently move to Florida and seek to exercise a power of appointment there; yet we held that

---

[39] *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984).

[40] *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021).

[41] *Burger King*, 471 U.S. at 482.

[42] *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1108 (9th Cir. 2020).

[43] *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Walden*, 571 U.S. at 285) (emphasis added).

[44] *Glob. Commodities*, 972 F.3d at 1108.

[45] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).

Florida courts could not constitutionally exercise jurisdiction over a Delaware trustee that had no other contacts with the forum State."[46]

## IV. DISCUSSION

### A. Personal Jurisdiction

The Court concludes it does not have personal jurisdiction over Aspen in this case and **GRANTS** the Motion accordingly.

As an initial matter, the Court finds Aspen is not subject to general personal jurisdiction in Alaska. Aspen is neither incorporated in Alaska nor has its principal place of business in Alaska.[47] And there is no indication, and Specialized does not argue, that Aspen is otherwise "essentially at home" in Alaska.[48]

Next, the Court concludes it also lacks specific jurisdiction over Aspen, primarily because Specialized has not established the first requirement of the Ninth Circuit's three-part test: purposeful availment. Simply put, Aspen's minimal contacts with Alaska do not reflect a deliberate effort by Aspen to promote or transact business in the forum.

#### 1. Purposeful Availment

Specialized has not established Aspen "purposefully avail[ed]" itself "of the privilege of conducting activities" in Alaska.[49] To begin, the parties' contractual relationship is centered in Canada, not Alaska: Aspen neither executed the at-issue contract nor performed any obligations

---

[46] *Id.* at 295–96.

[47] *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

[48] *See id.* at 139, n.19 (leaving open "the possibility that in an exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State").

[49] *Picot*, 780 F.3d at 1211 (quoting *Schwarzenegger*, 374 F.3d at 802).

stemming from the contract in Alaska.[50] It is undisputed that, consistent with Aspen's "general business practice,"[51] Aspen executed the contract in Aspen's office in Alberta, Canada; Aspen manufactured the Bomb Cart in Alberta; no Aspen employee or representative traveled to Alaska for business related to the sale and manufacture of the Bomb Cart; and Specialized picked up the Bomb Cart in Alberta for transport back to Alaska.[52] It is also undisputed that the Bomb Cart came with a one-year limited warranty, which specified that defective materials "must be returned to Aspen's facility at the owner's expense for inspection" and "shall be repaired or replaced by Aspen at its facility."[53] The record indicates, therefore, that aside from contracting with an Alaska company, Aspen had virtually no contact with Alaska in connection with the deal.

Despite this apparent disconnect between the underlying deal and the forum, Specialized argues the Court has specific jurisdiction over Aspen for three reasons. First, Specialized argues, Aspen knowingly contracted with an Alaska company: Aspen knew Specialized was an Alaska company, designed the Bomb Cart for use in Alaska, knew the Bomb Cart would be used in Alaska, and provided a warranty covering a one-year period during which Aspen knew the Bomb Cart would be used in Alaska.[54] Second, "Specialized is not the only company using Aspen's products in Alaska."[55] Specialized asserts, through affidavits, that Aspen "is well known in Alaska," "has sold many of its trailers to various Alaska companies for use in Alaska," and that its employees

---

[50] *See* Dkt. 33-1 at 2–3; *Hanson v. Denckla*, 357 U.S. 235, 251–52 (1958).

[51] Dkt. 33-1 at 3.

[52] *See id.* at 2–3.

[53] Dkt. 33-3 at 2 (Warranty).

[54] *See* Dkt. 41 at 8–9.

[55] *Id.* at 8.

9

"have seen numerous Aspen branded trailers and equipment used in Alaska."[56] Third, Aspen has attended trade shows in Las Vegas, Nevada, and otherwise targets the United States by marketing itself as a leader in "North America."[57]

To support its argument that these facts confer specific jurisdiction, Specialized relies heavily on a 2005 decision by the Alaska Supreme Court, *Polar Supply Company, Inc. v. Steelmaster Industries, Inc.*[58] In *Polar Supply*, the Alaska Supreme Court held that a Canadian manufacturer purposefully availed itself of the privilege of doing business in Alaska by knowingly contracting with an Alaska company, attending a trade show in Nevada, and advertising in the United States, among other contacts.[59] While the Court acknowledges the factual similarities between the present case and *Polar Supply*, the Court finds the decision unpersuasive for the reasons discussed below.[60] Similarly, the Court finds each of Specialized's arguments insufficient to establish purposeful availment.

Specialized's primary argument fails for two reasons. First, as discussed above, a contract alone is not enough, and the parties' contract did not create a sufficient connection between Aspen and Alaska to establish purposeful availment.[61] The contract was executed in Canada and appears

---

[56] Dkt. 41-1 at 1; Dkt. 41-4 at 1.

[57] Dkt. 41 at 8.

[58] 127 P.3d 52 (Alaska 2005); Dkt. 41 at 7–8.

[59] *Polar Supply*, 127 P.3d at 56.

[60] The Alaska Supreme Court's opinion in *Polar Supply*, while entitled to great respect, is not binding on the Court with respect to the due process analysis required here. *See Watson v. Estelle*, 886 F.2d 1093, 1095 (9th Cir. 1989) (a state supreme court opinion construing the United States Constitution is not binding on federal courts).

[61] *See Boschetto*, 539 F.3d at 1017 (citing *Burger King*, 471 U.S. at 478); *Burger King*, 471 U.S. at 478 (commenting that "an individual's contract with an out-of-state party alone . . . clearly"

designed such that Aspen could perform all obligations under the contract in Canada, including its limited ongoing obligations stemming from the warranty.[62] Further, the purchase agreement and warranty include choice-of-law provisions selecting the laws of the Province of Alberta, Canada.[63] On these facts, the Court cannot conclude that the parties "envisioned continuing and wide-reaching contacts" in Alaska.[64] In short, the contract was not "centered" in Alaska and, without more, does not provide a basis for jurisdiction.[65]

Second, it is not enough that Aspen *knew* Specialized was an Alaska company or that Aspen *knew* the Bomb Cart would be used in Alaska because foreseeability is not the criterion.[66] Rather, Specialized must show that Aspen "deliberately 'reached out beyond' its home" to Alaska.[67] Specialized provides no indication that Aspen took such deliberate action. For example, Specialized does not allege Aspen targeted Specialized or otherwise targets Alaska companies, through advertising or other methods. The record reflects instead that Aspen, through its general practices, has minimized its contacts with Alaska, even where, as here, it contracts with an Alaska

---

cannot establish jurisdiction); *see also Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum.").

[62] Dkt. 33-1 at 2–3.

[63] Dkt. 33-2 at 3; Dkt. 33-3 at 2.

[64] *Walden*, 571 U.S. at 285 (quoting *Burger King*, 471 U.S. at 479–80). *Compare Glob. Commodities*, 972 F.3d at 1108–10 (finding personal jurisdiction where a defendant "sustained a relationship with [the plaintiff] over several years and hundreds of contracts, purchasing millions of dollars of goods" and had "acknowledged its ongoing obligations to make payments in [the forum state]") *with Boschetto*, 539 F.3d at 1017 (finding no purposeful availment where the parties contracted for "the sale of one item" with "no ongoing obligations" in the forum).

[65] *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Walden*, 571 U.S. at 285).

[66] *See World-Wide Volkswagen Corp.*, 444 U.S. at 295.

[67] *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Walden*, 571 U.S. at 285).

company. Without disputing these practices, Specialized argues that by simply contracting with an Alaska company to manufacture equipment for that company which it knew would be used in Alaska, Aspen purposefully availed itself of the Alaska market.[68] To the extent *Polar Supply* suggests foreseeability of this kind is enough to establish purposeful availment, the Alaska Supreme Court appears to have taken an expansive approach to specific jurisdiction that has been foreclosed by the United States Supreme Court.[69]

Nor does Aspen's reputation in Alaska establish purposeful availment. The record does not reflect that Aspen's reputation or, relatedly, its prior sales to Alaska companies resulted from deliberate efforts by Aspen to promote or transact business in the forum.[70] For example, while Specialized reports seeing Aspen products in Alaska, it offers no evidence that Aspen advertises in Alaska or otherwise targets Alaska specifically. The record does show, however, that Aspen has no offices, employees, or facilities in Alaska; is not registered to do business in Alaska; and, apart from attending tradeshows in Nevada, generally conducts business locally in Alberta. On this

---

[68] *See* Dkt. 41 at 8.

[69] *See World-Wide Volkswagen Corp.*, 444 U.S. at 295; *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1783 (2017) (rejecting argument that the defendant's "decision to contract with a California company" provided a sufficient basis for personal jurisdiction in California); *see, e.g.*, *Pac. Helicopter Tours, Inc. v. Dragonfly Aviation, LLC*, No. CV 19-00295 ACK-RT, 2019 WL 5053054, at *7 (D. Haw. Oct. 8, 2019) ("While Pacific Helicopter points to Dragonfly's knowledge that the 'helicopter would be delivered and operated in Hawaii,' it was Pacific Helicopter who performed this delivery and conducted these operations. Failure to consider this distinction improperly shifts the minimum contacts analysis to 'defendant's contacts with persons who reside' in the forum State, rather than 'the defendant's contacts with the forum State itself.'") (quoting *Walden*, 571 U.S. at 285) (internal citations omitted).

[70] *Boschetto*, 539 F.3d at 1016 (quoting *Sher*, 911 F.2d at 1362).

record, the Court cannot infer that Aspen's contacts with Alaska, including its sales to an unspecified number of Alaska companies, are more than "fortuitous."[71]

Finally, Aspen has not purposefully availed itself of the privilege of doing business in Alaska by attending trade shows in Nevada and mentioning "North America" on its website. On this point, *Polar Supply* is directly contradicted by subsequent precedent. Six years after *Polar Supply*, the United States Supreme Court in *J. McIntyre Machinery, Ltd. v. Nicastro*[72] rejected the argument that a defendant "purposefully availed itself of the New Jersey market" by agreeing to sell machines in the United States and attending "trade shows in several States but not in New Jersey," even though the defendant "might have predicted" its machines would end up in New Jersey.[73] The Court reasoned, "These facts may reveal an intent to serve the U.S. market, but they do not show that J. McIntyre purposefully availed itself of the New Jersey market."[74] Here too, Aspen's contacts "may reveal an intent to serve the U.S. market, but they do not show that [Aspen] purposefully availed itself of the [Alaska] market."[75]

2. Relatedness

Even if Aspen purposefully availed itself of the Alaska market to some extent by selling trailers to other Alaska companies, Specialized presents no evidence that those sales are

---

[71] *Picot*, 780 F.3d at 1211.

[72] 564 U.S. 873 (2011) (plurality).

[73] *Id.* at 882, 886 (opinion of Kennedy, J.).

[74] *Id.* at 886; *see also id.* at 888 (Breyer, J., concurring).

[75] *Id.* at 886; *see also LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 862 (9th Cir. 2022) (finding no jurisdiction where "[m]any of the allegations in the complaint pertain to Continental's nationwide contacts rather than Continental's contacts with Arizona specifically").

sufficiently related to its claims to satisfy the second requirement for specific jurisdiction: that the claims arise out of or relate to the defendant's forum-related activities.[76]

It is unclear to what extent a plaintiff can establish specific jurisdiction on the basis that a defendant sold products to other customers in the forum. The Supreme Court most recently addressed this issue in *Ford Motor Co. v. Montana Eighth Judicial District Court*.[77] At issue in *Ford* was whether state courts in Montana and Minnesota properly exercised specific jurisdiction over the defendant, Ford, in two cases arising from car accidents in those states. In both cases, "Ford had advertised, sold, and serviced" cars identical to those involved in the accidents "in both States for many years" but had "sold the specific cars involved in these crashes outside the forum States, with consumers later selling them to the States' residents."[78] There was no dispute that Ford purposefully availed itself of Montana and Minnesota markets.[79] The question was, rather, whether Ford's extensive contacts with the forum were sufficiently related to the plaintiffs' claims.[80] The Court held they were, reasoning that "Ford had systematically served a market in Montana and Minnesota *for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States*. So there is a strong 'relationship among the defendant, the forum, and the litigation.'"[81] Thus, the Court found relatedness on the basis that Ford purposefully availed itself of the Montana and Minnesota markets by "extensively promot[ing], s[elling], and service[ing]" in Montana and

---

[76] *Picot*, 780 F.3d at 1211.

[77] 141 S. Ct. 1017 (2021).

[78] *Id.* at 1028–29.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 1028 (emphasis added).

Minnesota products identical to those underlying the litigation.[82] The Court added that (1) "allowing jurisdiction in these cases treats Ford fairly" because it was undoubtedly predictable from Ford's extensive conduct in both states that it might be sued in both forums[83] and (2) principles of interstate federalism supported jurisdiction because Montana and Minnesota had significant interests in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors" and "enforcing their own safety regulations."[84]

*Ford*'s holding appears confined to its facts,[85] which bear little resemblance to those presented in this case. Here, Specialized claims the Bomb Cart was custom-built for Specialized and that Aspen has sold "trailers" to other Alaska companies.[86] But Specialized does not claim those trailers are the same model as the Bomb Cart or even similar to the Bomb Cart. Thus, unlike in *Ford*, Specialized does not claim Aspen has advertised, sold, or serviced identical products in Alaska. In *Ford*, the Court declined to address cases like this one in which a defendant perhaps sells similar, but not identical, products in the forum: "Ford had advertised, sold, and serviced those two car models in both States for many years. (Contrast a case, which we do not address, in which Ford marketed the models in only a different State or region.)"[87] Consequently, the Ninth Circuit, applying *Ford*, has declined to find relatedness where, as here, the plaintiff does not allege

---

[82] *Id.* at 1032.

[83] *Id.* at 1029.

[84] *Id.*

[85] *See LNS Enters. LLC*, 22 F.4th at 864 ("The Court explicitly noted that it was cabining *Ford* only to those circumstances in which the same model of the product at issue was 'advertised, sold, and serviced' by the defendant.").

[86] Dkt. 41-1 at 1.

[87] *Ford Motor Co.*, 141 S. Ct. at 1028.

that the defendant's contacts with the forum involved the "specific type of [product] at issue" in the litigation.[88] Further, unlike in *Ford*, Aspen does not have a "veritable truckload of contacts" with Alaska such that it might expect to be sued here.[89] Thus, even if Aspen has purposefully availed itself of the Alaska market by selling trailers to other Alaska companies, the Court cannot conclude this litigation relates to those sales such that they give rise to specific jurisdiction. Because Specialized has not met its burden of proving purposeful availment and relatedness, the Court need not consider whether exercising jurisdiction would be reasonable.[90]

The Court concludes it lacks specific jurisdiction over Aspen and **GRANTS** the Motion accordingly. Because the Court concludes it lacks personal jurisdiction to hear Specialized's case against Aspen, it does not reach Aspen's argument that Specialized has failed to state a claim upon which relief can be granted.

---

[88] *See LNS Enters. LLC*, 22 F.4th at 863 ("[P]laintiffs have not established that their injuries in this case arise out of or relate to Continental's contacts with the forum. Plaintiffs do not allege that any of these repair shops worked on the engine in Plaintiffs' aircraft or the type of engine at issue in this case. The existence of these four repair shops, without more, is insufficient to show that Continental 'continuously and deliberately exploited' Arizona's market with respect to the specific type of engine at issue."); *see also id.* at 864 ("The Supreme Court repeatedly emphasized in *Ford* that Ford had advertised, sold, and maintained the precise vehicles at issue in the case—the Ford Crown Victoria and Ford Explorer—in the relevant jurisdictions. The Court explicitly noted that it was cabining *Ford* only to those circumstances in which the same model of the product at issue was 'advertised, sold, and serviced' by the defendant.") (internal citation omitted).

[89] *Ford Motor Co.*, 141 S. Ct. at 1031; *see also id.* at 1028 ("By every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail—Ford urges Montanans and Minnesotans to buy its vehicles, including (at all relevant times) Explorers and Crown Victorias.").

[90] *See Picot*, 780 F.3d at 1211.

B. *Jurisdictional Discovery*

The Court also denies Specialized's request for jurisdictional discovery. District courts have "broad discretion to permit or deny [jurisdictional] discovery."[91] Courts ordinarily allow jurisdictional discovery "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."[92] However, a court may deny a request for jurisdictional discovery that is "based on little more than a hunch that it might yield jurisdictionally relevant facts."[93] Likewise, a "[c]ourt need not permit even limited discovery" where the "plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants."[94]

Specialized asks for "the opportunity to conduct discovery into the full range of Aspen's business in, and directed to, Alaska."[95] Specialized does not articulate what it expects to uncover if given the opportunity.[96] The Court declines to speculate why and how Specialized believes discovery would be helpful and denies the request accordingly.[97]

---

[91] *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986).

[92] *Boschetto*, 539 F.3d at 1020 (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)).

[93] *Boschetto*, 539 F.3d at 1020.

[94] *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (quoting *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995)).

[95] Dkt. 41 at 2.

[96] *See generally id.*

[97] *See LNS Enters. LLC*, 22 F.4th at 865 (affirming district court's decision denying jurisdictional discovery where "Plaintiffs sought jurisdictional discovery without providing any affidavit or evidence substantiating their requests or describing with any precision how such discovery could be helpful to the Court.") (internal quotations omitted).

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Aspen's Motion to Dismiss at Docket 33.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 28th day of February, 2022.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE